**SCHWARTZ v. NORTHERN LIFE INS. CO.**

Circuit Court of Appeals, Ninth Circuit.
April 16, 1928.

Rehearing Denied May 14, 1928.

No. 5318.

**1. Insurance ⬦175—Effective date of policy is date from which risk commences, determined by provisions of contract.**

The date from which a policy of insurance becomes effective is not necessarily determined by the date which it bears, or the date of its execution or delivery, or by date when first premium is paid, but it is the date from which the risk commences, determined by the meaning of the provisions of the contract.

**2. Insurance ⬦132—"Binding receipt" or "binding slip" protects applicant for life insurance against sickness between its date and delivery of policy.**

A "binding receipt" or "binding slip" protects the applicant for life insurance against the contingency of sickness intervening between its date and the delivery of the policy if the application is accepted.

[Ed. Note.—For other definitions, see Words and Phrases, Second Series, Bind.]

**3. Insurance ⬦175—Life insurance becomes effective from date specified in binding slip, if company accepts application and approves risk.**

When a binding slip provides by its terms that subject to approval and acceptance insurance shall be effective from specified date, and company accepts the application or approves the risk, insurance becomes operative from the date specified.

**4. Insurance ⬦175—Effect will be given agreement that life policy shall take effect from date of application.**

Effect will be given to an agreement that life insurance policy shall be dated as of the date of the application and relate back to and take effect from that date.

**5. Insurance ⬦400—Life policy held to have become effective on date of application and due date, not on date it bore as respects contestable year.**

Application for life insurance was made and medical examination had on August 2, and on that date applicant gave his note for first year's premium and received a conditional binding receipt. Policy dated August 14 was subsequently issued, but premium due date was made in accordance with its terms on date of medical examination, August 2. Policy contained a clause making it incontestable except for nonpayment of premiums after one year from date, and provided that insurance should not take effect unless a full premium was paid in cash. *Held*, that policy became effective August 2, when risk attached, and the contestable year had expired at time of insured's suicide on August 9 of the following year.

**6. Insurance ⬦146(1)—Every part of insurance contract must, if possible, be given effect.**

In construing a contract of insurance, every part thereof must, if possible, be given effect, and no part is to be rejected unless repugnant to the intention of the parties as set forth in the component parts of the agreement.

**7. Insurance ⬦141(2)—Provision that life insurance shall not take effect unless full premium is paid in cash may be waived by company.**

An insurance company can waive any provisions of its policy, and provision of life insurance policy that insurance shall not take effect unless a full premium is paid in cash could therefore be waived by company by accepting applicant's note for first year's premium.

**8. Insurance ⬦141(2)—General agent's acceptance of applicant's note for first year's premium held to render life policy effective, notwithstanding provision requiring cash.**

Where insurance company's instructions to its general agent expressly contemplated that in connection with applications for new policies agent might take promissory notes, but made agent responsible for payment thereof, and evidence showed that the taking of notes on applications was in regular course of company's business, general agent's acceptance of applicant's note for first year's premium on life insurance policy constituted payment of premium for purposes of making insurance effective, notwithstanding provision of contract requiring full payment of premium in cash.

**9. Insurance ⬦665(3)—Evidence held not to show falsity of representation, in application for life policy, that applicant did not handle explosives.**

Evidence that insured, a general manager of an artificial silk manufacturing corporation, had at times requested his stenographer to stop him if she saw him going with a lighted cigarette toward the laboratory, *held* insufficient to establish that he made false representation, in his application for life insurance, in which he stated that he did not handle explosives.

**10. Insurance ⬦339—Explosion of chemicals in manufacturing plant of which insured was general manager held not to authorize cancellation of policy on ground insured engaged in handling "explosives."**

That insured was general manager of corporation which, in manufacturing artificial silk, used chemicals which became ignited when insured set fire to the plant to conceal a homicide committed by him and generated gases which exploded, *held* not to entitle insurer to cancellation of policy on ground that insured was engaged in the manufacture and handling of explosives in violation of policy; "explosive" being any substance by whose decomposition or combustion gas is generated with such rapidity that it can be used for blasting or in firearms.

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Explosive.]

**11. Insurance ⬦441—Policy provision that insurer shall not be liable for death of insured while engaged in specified occupation does not apply unless insured was engaged therein as a business.**

To render applicable a provision of life insurance policy that insurer shall not be liable for the death of insured while engaged in a specified occupation, the insured must have been

engaged in the specified occupation as a business rather than as a mere temporary or incidental employment.

**12. Insurance ⊚═339—Insured, by setting fire to manufacturing plant of which he was general manager to conceal homicide, held not to have changed occupation because of resulting explosions of chemicals; "blasting operations."**

Where insured set fire to artificial silk manufacturing plant of which he was general manager in order to destroy body of person whom he had killed, and chemicals necessarily used in connection with manufacturing the silk became ignited and generated gas and exploded, *held* that insured did not thereby change his occupation from that stated in his application for insurance to that of engaging "in blasting operations" in violation of policy as claimed by insurer.

**13. Insurance ⊚═265—Warranty in application must be literally fulfilled, but representation is satisfied if substantially true.**

A warranty in an application for insurance must be literally and exactly fulfilled, but a representation is satisfied if it is substantially true, and a slight variance which would not have influenced the action of the insurer in making the contract will not defeat the policy.

In Error to the District Court of the United States for the Southern Division of the Northern District of California; Frank H. Kerrigan, Judge.

Suit by the Northern Life Insurance Company against Alice Edith Schwartz. Decree for complainant (19 F.[2d] 142), and defendant brings error. Reversed and remanded, with instruction.

The appellee, a life insurance company having its principal place of business at Seattle, Wash., brought a suit to cancel a contract of life insurance on three grounds: That the insured committed suicide within the first year of the policy; that he engaged in the manufacture and handling of explosives; and that he changed his occupation. It was undisputed that the insured committed suicide on August 9, 1925. The application for the policy contained a provision that the insurance should be void except for the amount of the premium paid therefor in the event that the insured committed suicide within one year "from date policy becomes effective." The complaint alleged that the date when the policy became effective was August 14, 1924. The appellant alleged that the date was August 2, 1924. On August 2, 1924, the appellee's agent at Oakland, Cal., obtained the signature of the insured to an application for life insurance and accepted in full settlement for the first year's premium the note of the insured payable to himself and indorsed in blank. On the same day the insured was examined and passed for insurance by the appellee's medical examiner by his written approval upon the application, and the agent delivered to the insured its standard binding receipt as follows:

"Conditional Binding Receipt.
"(No. 87212)

Oakland, Calif. Aug. 2, 1924.

"Northern Life Insurance Co., Seattle, Wash.

"Received from Henri Charles Schwartz an application, bearing same number as this receipt for $25,000 insurance on his life and nine hundred (note) dollars in cash, in full settlement of premium thereon; provided, settlement for the full premium has been previously made, the insurance applied for (not in excess of limits below) shall take effect when an examination of the applicant satisfactory to the company has been made by its medical examiner; provided, nothing is developed as existing at or prior to the time of said examination which would ordinarily cause rejection at the company's home office for the plan and (or) amount of insurance applied for. If application is not accepted the settlement made as above stated will be returned upon surrender of this receipt. In no event shall the company be liable under any insurance covering the applicant for a total (including any insurance previously issued or applied for) of more than $25,000 life insurance or $50,000 inclusive of double indemnity for accidental death (except if applicant is a female company's limit of liability shall be $5,000 in any event) until policy is actually issued by the company. The applicant agrees to promptly obtain a medical examination by a regular examiner of the company.

"This receipt must not be given unless settlement is made for full premium.

"[Signed]
"Walter E. Felthouse, Agent."

The application and the promissory note were forwarded to Seattle by the agent, and the appellee thereupon issued the policy of life insurance with the application attached, dated as of August 14, 1924, and forwarded the same, together with the premium note, to its said agent at Oakland. The agent delivered the policy to the insured, but he did not collect upon the note until some months later. The policy fixed the next premium due date at August 2, 1925, and the appellee proceeded to reinsure the risk to the extent of 60 per cent. thereof from August 2, 1924, to August 2, 1925. The appellee's agent at Oakland was in his contract with the appellee described as a general agent, with the territory of Alameda and various adjacent coun-

ties in California assigned to him, and he had the privilege of employing subagents. The appellee's general instructions to him provided that agents accepting notes for premiums did so at their own risk, and among general instructions was, in substance, the following: That in settlements taken for new policies the agents must "avoid making alterations on notes"; that notes, if taken, must be made out for the full premium even if part thereof was paid in cash, in which event the agents were to indorse the amount of such cash payment on the back of the note; that notes must not be made payable to the company; that, if made payable to the agent, he must indorse them before sending them to the home office for inspection; that, if the notes drawn by the applicant were payable to himself he must indorse his name on the back as well as signing on the face of the note; that premium notes were entirely at the agent's risk, and that the company assumed no responsibility for their collection; that "the printed receipt attached to application blank states the only conditions under which a settlement of any kind is to be accepted at date of application or at any time prior to delivery of policy. This receipt should always be given in case any such advance settlement is made." The court below held that the policy became effective on August 14, 1924, and, on the ground that the suicide occurred within a year from that date, decreed the cancellation of the policy upon the repayment to the appellant of the premium, less the costs of suit, and enjoined any action upon the policy by the appellant.

E. S. Bell, of Oakland, Cal., and Ford, Johnson & Bourquin, George K. Ford, Elliott Johnson, and M. M. Bourquin, all of San Francisco, Cal., for plaintiff in error.

Knight, Boland & Christin, of San Francisco, Cal. (John H. Riordan, of San Francisco, Cal., of counsel), for defendant in error.

Before GILBERT, RUDKIN, and DIETRICH, Circuit Judges.

GILBERT Circuit Judge (after stating the facts as above). [1] The principal question presented in the case is upon what date the policy became effective. The appellant says it was August 2, 1924. The appellee says it was August 14, 1924. The date from which a policy becomes effective is not necessarily determined by the date which it bears or the date of its execution or the date of its delivery or by the date when the first premium is paid. It is the date from which the risk commenced, and it is determined by the

meaning of the provisions of the insurance contract. Mutual Life Ins. Co. of New York v. Hurni Packing Co., 263 U. S. 167, 44 S. Ct. 90, 68 L. Ed. 235, 31 A. L. R. 102. Said the court in that case, page 175 (44 S. Ct. 91): "It was competent for the parties to agree that the effective date of the policy should be one prior to its actual execution or issue; and this, in our opinion, is what they did." In Anderson v. Mutual Life Ins. Co., 164 Cal. 712, 130 P. 726, Ann. Cas. 1914B, 903, it was held that the period of one year after the "issuance of this policy" does not exempt the company for a death by suicide occurring less than one year after the date when the policy was in fact signed by the officers of the company but more than one year after the date designated in the policy as its date, where it appears from other provisions of the policy, read in connection with the application, that the latter date was intended to be and was adopted by both parties as the date when the risk attached. In that case the court said: "The insurer, acting, so far as the record shows, with full knowledge of all the facts, elected to base its policy upon the first application, to date its policy May 22, 1908, the day upon which the medical examination of Anderson had taken place, to make the premiums payable on the 22d day of May of successive years. * * * In all these particulars, the company expressed its intention to fix the rights of the parties with reference to the 22d day of May in just the same way that these rights would have been fixed if a policy had been actually signed and delivered on that day. * * * The day upon which, by the agreement of the parties, the risk attached, may reasonably be taken to be the day which was meant to be designated, in the clause under consideration, as that of the 'issuance' of the policy." Here the contract for insurance consisted of three instruments, the application, the binding receipt, and the policy. The application contained the provision that the insurance should not take effect unless a full premium were paid in cash and the policy were delivered during the insured's lifetime and good health, also the provision that, if the full premium were paid in advance in cash to an authorized agent of the company and the conditional binding receipt were given by such agent without alteration of the printed conditions therein, "the insurance shall be in force when an examination satisfactory to the company has been made by the medical examiner, provided that nothing has developed as existing at or prior to the time of such examination which would ordinarily cause rejection

at the company's home office for the plan or the amount of insurance applied for." The conditional binding receipt contained a like provision. And the application further provided: "Unless otherwise requested, the premium due date of the policy shall be the date of my medical examination." Thus it appears that the binding receipt was denominated "conditional," for the reason that the insurer reserved to itself the right to reject the application and cancel the contract of insurance, notwithstanding that the receipt had been given and the premium paid.

[2-4] A binding receipt, or binding slip, has a settled meaning in insurance law. It protects the applicant for insurance against the contingency of sickness intervening between its date and the delivery of the policy if the application for insurance is accepted. 1 Joyce on Insurance, p. 253. When it provides by its terms that, subject to approval and acceptance, the insurance shall be effective from the specified date and the company accepts the application or approves the risk, it becomes operative from the date specified. 32 C. J. 1101; Rushing v. Manhattan Life Ins. Co. of New York (C. C. A.) 224 F. 74. It is well settled that effect will be given to an agreement that the policy shall be dated as of the date of the application, and shall relate back to and take effect from that date. Jefferson Standard Life Ins. Co. v. Wilson (C. C. A.) 260 F. 593; Fox v. New York Life Ins. Co., 211 Ill. App. 406; Beswick v. National Casualty Co., 206 Mo. App. 67, 226 S. W. 1031; Talbot v. Union Cent. Life Ins. Co. (C. C. A.) 241 F. 669.

[5] From a consideration of all the provisions of the contract here in question, we reach the conclusion that the minds of the contracting parties met in fixing upon August 2, 1924, as the date from which the policy became effective and as the date upon which the risk commenced and the date from which began the year during which the policy might be contestable for suicide. It was for a year commencing with that date that the insured paid the premium, and August 2 was made the date of the payment of each annual premium thereafter and the date upon which the appellee's reinsurance in another company took effect.

[6-8] The appellee relies upon the clause of the contract which provided that the insurance should not take effect unless a full premium was paid in cash, and points to the fact that the premium was paid by a promissory note. In construing a contract of insurance, it is a fundamental rule that every part of the contract must, if possible, be given effect,

and none is to be rejected unless repugnant to the intention of the parties as set forth in the component parts of the agreement. The provision that full premium shall have been made in cash is not necessarily inconsistent with a "settlement for the full premiums" made by giving a promissory note, when recourse is had to the facts and the course of dealing which the appellee had followed in authorizing its agents to receive promissory notes for the premiums and its acceptance of applications, accompanied with payments of premiums thus made. The agent who received the application here was a general agent, and he was so described in his contract with the appellee. In that contract he was made responsible for the acts of his subagents whom he had been given the power to employ. The general instructions which he received from the appellee expressly contemplated that in connection with the application for new policies he might take promissory notes, and as a matter of fact the evidence shows that the taking of notes on such applications by agents who thereupon became directly responsible to the company was in the regular course of the company's business. There can be no question but that the company could waive any provision of its policies, Knickerbocker Life Insurance Co. v. Norton, 96 U. S. 234, 24 L. Ed. 689, and could accept a promissory note as cash in the payment of premiums notwithstanding a stipulation to the contrary. In Kimbro v. Life Insurance Co., 134 Iowa, 84, 94, 96, 108 N. W. 1025, 1029 (12 L. R. A. [N. S.] 421), the court said: "No general rule adopted by an insurance company as to the prepayment of premiums can take away its power to waive or ignore such requirement and to bind itself by a contract without such payment. * * * It was a common practice known to and approved by the company for agents to take such notes payable to themselves; and charge themselves therewith in their agency accounts, the company holding the agents responsible as for a cash collection. Such a transaction is a payment of the premium as between the assured and the company." Among other cases so holding are Michigan Mut. Life Ins. Co. v. Hall, 60 Ill. App. 159; Kilborn v. Prudential Ins. Co., 99 Minn. 176, 185, 108 N. W. 861; Griffith v. Life Ins. Co., 101 Cal. 627, 36 P. 113, 40 Am. St. Rep. 96; Life Insurance Co. of Virginia v. Hairston, 108 Va. 832, 62 S. E. 1057, 128 Am. St. Rep. 989; Miller v. Brooklyn L. Ins. Co., 12 Wall. 285, 303, 20 L. Ed. 398; Smith v. Provident Sav. Assur. Soc. (C. C. A.) 65 F. 765; Metropolitan Life Ins. Co. v. William-

son (C. C. A.) 174 F. 116; Buckley v. Citizens' Ins. Co., 188 N. Y. 399, 81 N. E. 165, 13 L. R. A. (N. S.) 889; Imbrie v. Ins. Co., 178 Pa. 6, 35 A. 556; Lawrence v. Penn. Mut. Life Ins. Co., 113 La. 87, 36 So. 898, 1 Ann. Cas. 965. In Vance on Insurance, p. 178, it is said: "Even though the parties may have expressly agreed that the contract shall not be deemed complete until payment of the first premium in cash and in full, this stipulation may be waived by the insurer or any of his agents having competent authority. * * * And an absolute delivery of the policy by such an agent without payment of the premium, under such circumstances as will justify an inference that credit is to be given, will constitute a waiver of the condition of prepayment."

[9, 10] We cannot sustain the contention that the policy should be canceled on the grounds alleged in the complaint, that on July 29, 1925, in violation of the terms of the policy "the insured engaged in the manufacture and handling of explosives," and that on the same day he secretly and mysteriously changed and left his occupation, in which as he stated in his application he was engaged "and engaged in blasting operations." He had stated that he was employed with the Pacific Cellulose Company, Inc., and that the duties of his present occupation were "general manager, managing and supervision," in the business or trade of artificial silk manufacturing. The evidence was that on July 29, 1925, a fire occurred at the plant of the Pacific Cellulose Company, and that chemicals used in the manufacture of artificial silk were ignited, and that the gases thereby generated exploded. A letter which the insured had written to his wife contained his admission that he had set the fire to destroy the body of an assailant whom he had killed, he said, in self-defense. The testimony of his stenographer that at times he had requested her to stop him if she saw him going toward the laboratory with a lighted cigarette is not sufficient to show that he made false representations in his application. "An explosive may be defined as any substance by whose decomposition or combustion gas is generated with such rapidity that it can be used for blasting or in firearms." 25 C. J. 181, Century Dictionary. The chemicals used by the Cellulose Company were not explosives in that sense. The expert witness called by the appellee testified that none of them would explode from concussion or by contact with fire; that some of them had explosive vapors and were known as organic solvents and volatile combustibles which in the liquid form

"may be handled readily but with caution"; that their vapors form with the air explosive mixtures; and that, if each of them were kept properly corked and not exposed to the air, so that no vapor could escape, there would be no danger in handling them. Said he: "You could drop them and do anything you wanted with them, they will not explode." There is no question but that they were articles necessarily and customarily used in the business in which the insured was engaged.

There is no evidence that prior to the fire and the explosion the insured himself ever "handled" them. In fire insurance, "according to the weight of authority, if there are printed prohibitions against keeping certain articles on the insured premises, the policy will not be avoided by violation of these prohibitions if the prohibited articles are in customary use in carrying on the trade or business conducted on the premises." 26 C. J. 223. In 37 C. J. 471, it is said: "A policy may prohibit a change of occupation without the consent of the company, or provide for forfeiture where insured without the consent of insurer enters into a prohibited occupation, whether death results therefrom or not. But, in the absence of such provision, the policy will not be forfeited by reason of the fact that insured, subsequent to its issuance, engages in an extrahazardous occupation." In Stone's Adm'rs v. United States Casualty Co., 34 N. J. Law, 371, it was held that a stipulation that the assured shall not change his occupation applies only to cases in which he abandons his then occupation and engages in another employment as his usual business. In that case the insured had stated his occupation to be that of a school teacher. While temporarily out of employment as a teacher, he let a contract for the construction of a small barn on his premises, and, while overlooking the work, he fell from the building and was killed. The court held he had not changed his occupation for another, but was only engaged in an incidental matter which in no degree suspended his regular occupation.

[11] In order to render applicable the provision that the assurer shall not be liable for the death of the insured while engaged in a specified occupation, the "insured must have been engaged in the specified occupation, and furthermore he must have assumed it as a business rather than as a mere temporary or incidental employment." 32 C. J. 556. In Mortensen v. Central Life Assur. Ass'n, 124 Iowa, 277, 99 N. W. 1059, a risk excluded was the manufacture, handling, or transpor-

tation of explosives. The insured stated his occupation to be that of a dealer in pump and well supplies. He died as the result of an explosion which occurred during an attempt to blow out a well casing with dynamite. The court held that he was not engaged in the handling of explosives, but in the performance only of a casual act incident to his specified occupation. Said the court: "The assured may reasonably be required to abstain from dangerous occupations or employments, but can hardly be supposed to have understood that he must have in mind the terms of his policy in doing a particular act such as any person may incidentally feel himself called upon to do which does not involve the assumption of the risk of a specially hazardous and prohibited employment." In Gotfredson v. German Commercial Accident Co. (C. C. A.) 218 F. 582, L. R. A. 1915D, 312, the insured represented that he was a member of a truck company whose business was that of trucking, and that his occupation and duties were "proprietor, no manual labor." Incidental to a change in location of the offices and storage plant of the business, in the absence of the elevator conductor who had gone for the day, the insured operated an elevator at the new place of storage. On the third trip with the elevator, the cable parted, and the elevator car fell, causing the death of the insured. It was the contention of the assurer that the insured performed manual labor in a more hazardous occupation than that which was described in the policy. The court held that the term "occupation," as used in an application for accident insurance, is a very comprehensive one, and includes the incidental as well as the main requirements of one's vocation or business, being defined by lexicographers to be that which occupies or engages the time or attention and is the principal business of one's life employment or calling. In Ætna Life Ins. Co. v. Dunn (C. C. A.) 138 F. 629, the court held that the term "occupation," as employed in a policy, implies simply that which at the time of the accident constitutes the assured's principal business or pursuit, that which engages his attention and time as distinguished from that which is incidentally connected with the life of men at any or all occupations, and that the test in such cases is not so much whether the assured had in fact abandoned the occupation stated in the application, but whether or not, at the time of his injury, he was in fact engaged in another occupation not merely incidental, but as a business of a more hazardous classification.

[12, 13] There is no contention in the present case that there was contained in the laboratory or used therein any chemicals other than those which are necessarily connected with the manufacture of artificial silk, or that the explosion was incidental to or caused by the use of such chemicals in the business in which the insured was engaged. He used those chemicals, and caused the explosion only to cover up a crime, and his death was not caused thereby. The policy contained the following clause: "No warranty made by the insured shall be used in defense against any claim unless contained in a written application, and all warranties made by the insured shall, in the absence of fraud, be considered representations and not warranties." The law is well settled, as stated by Judge Wallace in Carrollton Furniture Mfg. Co. v. American Credit Indemnity Co. (C. C. A.) 124 F. 25, where it was held that a warranty in an application for insurance must be literally and exactly fulfilled, but a representation is satisfied if it is substantially true; and a slight variance which would not have influenced the action of the insurer in making the contract will not defeat the policy. The only representation made by the insured in his application was as to the nature of his occupation as above set forth and his negative answer to the question whether he contemplated any change in occupation or residence. There is nothing in the record to show that those representations were false.

The decree is reversed, and the cause is remanded, with instruction to dismiss the bill.