HARVEY v. UNION CENTRAL LIFE INS. CO. *

No. 3027.

Circuit Court of Appeals, Fourth Circuit.

Oct. 21, 1930.

Rehearing Denied Jan. 13, 1931.

*Certiorari denied 51 S. Ct. ——, 75 L. Ed. ——.

Randolph Murdaugh, of Hampton, S. C., for appellant.

Morris Lumpkin and Pinckney L. Cain, both of Columbia, S. C. (Thomas & Lumpkin, of Columbia, S. C., on the brief), for appellee.

Before PARKER, Circuit Judge, and WATKINS and SOPER, District Judges.

WATKINS, District Judge.

In order to understand and determine the issues in this case, it is necessary to set out a detailed and somewhat lengthy statement of facts. Appellant was named as the beneficiary upon a policy of insurance issued by appellee upon the life of her father, Willie Lawrence Brant. The application was dated October 22, 1918, was approved November 7, 1918 and the policy signed on November 9, 1918. The policy provided for a premium of $151.60 to be paid annually on October 22. The first premium was paid on the date of the application, and a receipt, incorporated in and forming a part thereof, was issued by the company's agent containing, inter alia, the following:

"It is agreed and understood that if said application is received and is approved on the plan and for the amount applied for, by said company at its home office, the said applicant will be insured from the date of such approval subject to the terms and conditions of the policy contract of said company; otherwise, there will be no liability upon the part of the company," etc.

This application was made a part of the policy contract. The insured died on June 25, 1929, having paid all premiums up to the one falling due October 22, 1928. Meanwhile, he had procured on June 26, 1926, a loan of $700 and evidenced the same by his policy lien note. He had also borrowed on October 22, 1927, for the purpose of meeting the premium then due the sum of $94.22, evidencing the same by his premium lien note. The aggregate amount due on October 22, 1928 on these two notes, including interest, was $825.-36. He defaulted in the payment of the 1928 premium. On that date the policy value in excess of the indebtedness was, excluding from consideration the dividend of 1928, $42.-64, and it is admitted that this amount was applied by the company in accordance with the provisions of the policy to the purchase of extended term insurance for a period of 237 days. It is admitted further that an additional sum of $33.48 accrued on the 1928 anniversary of the policy as an annual dividend. Appellant contends that this sum should have been applied to the purchase of extended term insurance upon the lapse of the policy, while appellee contends that it was payable only in cash. So far as the record shows, the company held this dividend and made no offer to pay it in cash until July 16, 1929, some weeks after the insured's death. Meanwhile, on December 6, 1928, the insured was notified by the company through its state manager as follows:

"You have a premium unpaid on policy #585106 of $151.60 less dividend of $33.48, leaving a net premium of $118.12 which was due October 22.

"Because of the indebtedness on the policy we can only offer to accept a note for $180.51 which will leave a balance in cash of $31.83, plus interest on note of $5.65, making a total of $37.48.

"Please let us hear from you and arrange a settlement to keep your policy in force. We inclose a note for your signature and trust it is convenient at this time to send us the cash necessary, also ask that you fill out and return the blank 356 inclosed."

This letter was followed by another letter from the home office, dated January 15, stating that the policy had been allowed to lapse and urging the importance of continuing the policy. Again on February 2, the home office wrote the insured renewing the offer to make a new loan for $906 upon the payment of $37.48 in cash, stating that this arrangement would provide for the payment of the premium and include all other indebtedness on the policy and provide for all payments up to the following October. This letter contained the following paragraph:

"If the policy is not reinstated, its present value, in excess of the indebtedness, will be applied to the purchase of extended insurance in accordance with the terms of the policy. This extended insurance will expire and the policy will be absolutely null and void on June 16, 1929."

Following this and other correspondence, the appellant on March 12 wrote the company as follows:

"Inclosed you will find ck $40.00 amount asked with dividend to reinstate W. L. Brant's life insurance policy. Your letter to my father has just reached me and as you know I am trying to carry this for him. Please send Drs. certificate to him at once."

This letter, with inclosures, was referred to the state manager of the company in South Carolina, who on April 18 wrote Mrs. Harvey, forwarding form for the completion of the transaction and requesting that the insured call on one of the company's medical examiners. Following this, several letters were written by the company's manager to Mrs. Harvey urging the completion of the transaction. Thereafter the insured was examined by one of the company's physicians who testified at the trial that he examined the insured on June 11, 1929, and reported on June 15, 1929, that he was not "a standard risk now."

Notwithstanding the above negotiations, the secretary of the company on June 24 forwarded to the insured an acknowledgment of a partial payment of interest on loan, stating: "Your remittance of $40.00 has been applied as partial payment of interest on the loan on your policy. There is a balance of $43.37 payable." Although this was signed in the name of the secretary, the assistant secretary of the company testified that this acknowledgment was made by the remittance clerk through error because of his failure to note that the policy was in a lapsed condition and that it was sent because it was the customary notice of the company acknowledging receipt of interest payments where the policy is in good standing. It must be observed, however, that previous acknowledgment of the receipt of the $40 had been made and that the check had been held pending negotiations for the reinstatement of the policy and that this receipt was made out and forwarded to the insured after the receipt of the medical examiner's certificate which was forwarded under date of June 15 and at a time when the company had in its hands all the data upon which to reinstate or deny reinstatement of the policy.

It will be observed further that the evidence shows that with all the facts before it the company did not offer to return this $40 until July 25, one month after insured's death, when the assistant secretary advised the appellant that the $40 was accepted under the condition that satisfactory evidence of good health should be furnished, and therein returned the amount by check which bore date July 3, 1929. The company had been notified of the insured's death by letter of June 25, 1929.

Briefly stated, the contention of the appellant at the trial was, and is now: First, that the effective date of the policy being November 7, the extended term insurance purchased by the admitted reserve of $42.64 ran for 237 days from that date and carried the insurance beyond the date of the death of the deceased; second, that the dividend accruing on the anniversary date of the policy in 1928 in the sum of $33.48 should have been applied to the purchase of extended term insurance, thus carrying the policy forward for an additional period of approximately 186 days; third, that the company's receipt and application of the $40 remittance to the reduction of the loan thereby increased the reserve on the policy to an amount sufficient to extend the insurance for an additional period of approximately 222 days, and that in any event there was a substantial question of fact as to the application of these amounts which the court erred in not submitting to the jury.

Appellee contends: First, that the extended term insurance purchased by the $42.64 reserve ran from October 22 and expired on June 16; second, that the 1928 dividend of $33.48 was payable under the terms of the policy only in cash; and, third, that the application of the $40 to the payment of interest on the loan was through error, without right, and that it cannot be held, therefore, to have reduced the loan or extended the term of its insurance.

A further outlining of the facts in stating the provisions of the policy will be necessary, but will be more appropriately discussed in considering the law of the case.

At the conclusion of the testimony the trial judge sustained the contention of the appellee and directed a verdict in its favor.

The appeal is based upon some fourteen exceptions, including subdivisions; but these may be comprehensively discussed under the three issues above set out.

██ Preliminary to a discussion of the specific issues involved, we call attention to the fact that an insurance policy, such as here under consideration, is a contract for life, that forfeitures are not favored by the law, and that ambiguous clauses should be construed most favorably for the insured, and that in case of repugnant clauses, that favorable to the insured must be adopted. And it is a fact universally recognized that policies of insurance are prepared by the companies

and that if ambiguity exists in their provisions so that either one of two views may be reasonably adopted by the courts, that view will be sustained which is most favorable to the insured. First National Bank v. Insurance Co., 95 U. S. 673, 24 L. Ed. 563; Moulor v. American Life Ins. Co., 111 U. S. 335, 4 S. Ct. 466, 28 L. Ed. 447; Liverpool, etc., Ins. Co. v. Kearney, 180 U. S. 132, 21 S. Ct. 326, 45 L. Ed. 460; Hunt v. Springfield, etc., Ins. Co., 196 U. S. 47, 25 S. Ct. 179, 49 L. Ed. 382; Kelsey v. Union Central Life Ins. Co. (C. C. A.) 196 F. 195.

Bearing these general principles in mind, we proceed to a discussion of the three main issues in the case.

■ 1. Anniversary date from which the extended insurance purchased by the policy reserve of $42.64 began.

Three separate dates are mentioned in the policy. October 22 is definitely fixed as the date upon which annual premiums must be paid in advance. It was agreed, however, that the policy should not become effective until the application was approved by the company and the date of such approval is November 7. The policy itself was not signed by the company nor dated until November 9. The result of the agreement between the parties was to require the insured to prepay his premiums sixteen days before receiving any benefit therefrom. It was an apparently somewhat insignificant and perhaps unforeseen hardship to which he became bound. In the matter of lapse it might have been serious, and if appellee's contention is correct, it results in the tragedy of forfeiture. While giving full effect to the stipulation and the consequent liability of early lapse because of this agreement, it will nevertheless appear from a study of the application and of the policy that such a construction would do violence to the plainly expressed agreements of the parties. It will be observed that the word "lapse" as used in the policy is given a limited meaning. In article 8 it is provided that failure to pay any of the first three years' premiums or installments thereof shall avoid and nullify the contract. It is further provided, however, that after three full years' premiums have been paid, on failure to pay any subsequent premium the policy shall lapse and its value shall be applied as set forth in article 13. This article defines policy values and directs the manner of their application at the option of the insured. After payment of three full years' premiums, it is provided that the reserve value of the policy may, at the election of the insured, be used

in any one of four ways provided there is no indebtedness or advances on the policy. Automatically, if no option is exercised by the insured, the company is required to apply any policy reserve value to the purchase of extended participating term insurance.

■ There can be no doubt under the decisions that the requirement to pay premiums annually in advance on October 22 was a valid and binding agreement. The minds of the parties definitely met upon that point, and there is nothing in the record to indicate that the insured was in any way misled. Failure to pay any annual premium on that date resulted, after thirty days' grace, in lapse. This only meant, however, that thereafter the insured had forfeited his right to keep the policy alive by subsequent payment of premiums. To restore such right required reinstatement under the rules and regulations of the company. Such lapse, however, in no way avoided his right to extended insurance if entitled thereto under the other conditions of the policy. There are numerous cases, among them Wilkinson v. Commonwealth Life Ins. Co., 176 Ky. 833, 197 S. W. 557, 6 A. L. R. 774; Davis v. Home Insurance Co., 125 S. C. 381, 118 S. E. 536; Halsey v. American Life Ins. Co., 258 Mo. 659, 167 S. W. 951; Schwartz v. Northern Life Ins. Co. (C. C. A.) 25 F.(2d) 555; Burner v. American Ins. Co., 221 Mo. App. 1193, 300 S. W. 556; Stinchcombe v. New York Life Ins. Co., 46 Or. 316, 80 P. 213; Stramback v. Fidelity Mutual Life Ins. Co., 94 Minn. 281, 102 N. W. 731, which hold that by agreement a policy may become effective and the policy year begin at a date prior to the approval of the application, or at the date of the actual issuance of the policy, or on a date on which the premium is actually paid. This was true in the case of Sellars v. Continental Life Ins. Co. (C. C. A.) 30 F.(2d) 42, wherein application was made on July 18; the policy was dated August 7 but the insured delayed acceptance of it, and it was not delivered to him until November 19. During the interval Sellars had no insurance, but the policy, which had been held in abeyance from the date of its execution, was finally accepted by the insured and it provided that after delivery to the insured it should take effect as of the date of August 7. It also provided that the insurance was granted for the term ending on August 7 and should be continued thereafter on the payment of the annual premiums on that date in every year during the continuance of the policy. It will be seen, therefore, that the effective date of the policy

year was agreed upon as beginning August 7. In that case, as in a number of other decided cases, a special reason for accepting the policy as delivered was the fact that the insured's age at the time of delivery would have called for a higher premium and perhaps would have excluded him from obtaining insurance at all. Johnson v. Mutual Benefit Life Ins. Co. (C. C. A.) 143 F. 950; McCampbell v. New York Life Ins. Co. (C. C. A.) 288 F. 465.

In the case of Wilkie v. New York Life Ins. Co., 146 N. C. 513, 60 S. E. 427, which is greatly emphasized by counsel for appellee, the court based its decision upon the ground that it was clear under the terms of the policy that the parties intended to make the date of the payment of the premium the beginning of each insurance year. There was no stipulation as in the instant case that it should begin on the date of approval of the application. A review of the numerous authorities cited in appellee's brief will disclose no case, nor do we think any can be found, of persuasive force, in which the mere provision for payment of premiums in advance was construed to overcome the plain provisions of a policy that it should take effect on a subsequent date. Had the parties agreed that the policy should not become effective until approved but that if and when approved the insurance year should run from October 22, appellee's contention would be sustained by the weight of authority. It has been held in numerous cases that where the effective date of a policy is agreed upon as the beginning of the policy year, such date must govern though the premium may not have been paid until a later date nor the policy delivered until such time. In the instant case the parties were at liberty to agree, as they did agree, upon the payment of the premiums in advance, and that the policy should not be issued or become effective until a later date. They might have agreed, as has frequently been done, that the policy should be issued or become effective at a date prior to the payment of the premium. Indeed, there is no reason, except as founded in the wise conduct of business, why an insurance company should not deliver a policy and.let it become effective on a certain date and credit the payment of the premium for a period of six months thereafter. Its right to require payment in advance was no higher than its right to extend credit. In such case it is hardly conceivable that the insurance company would contend that the insurance year began at the time of the payment of the premium and ran

one year from that date, in the face of the declaration of the policy that it ran from another date. It will be observed that the premium was an annual one, that it paid for one full year's insurance and not for one year less sixteen days as contended for by appellee.

A reference to the policy will clearly show that the date, October 22, related only to the day for paying premiums. In providing for incontestability, article 21 of the policy provides that it shall be incontestable after one year "from date of issue, except for non-payment of premium," and certainly the policy was not issued until the application was approved by the company. In article 25 it is provided that the policy shall be avoided by the suicide of the insured "within one year." We cannot conceive of the company's asserting that this limited the time to one year from the date of the application and the date of the payment of premium. The expression "policy year" or "end of the policy year" is mentioned no less than three times in the policy, and there also appears the expression "on the anniversary of the policy." This evidently refers to the anniversary of the birth of the policy which occurred on the approval of the application. It is true that option 1, article 14, of the policy states that the reserve value shall be applied to the extension of this policy as participating term insurance "from the date to which premiums have been paid." It does not state, however, that this shall be from the date on which premiums are paid or are required to be paid. Subscriptions to newspapers and periodicals are frequently required to be paid in advance, but when an annual subscription is thus paid, it is paid to the anniversary date from which the subscription begins to run and not from the date on which payment was made. The same is frequently applied to other business organizations, social clubs, etc. Where dues are paid in advance, they are universally recognized as covering the period from which the privilege, for which payment is made, begins to run and not from the date of payment itself. We think it clear, therefore, that the date to which premiums were paid as provided in the policy was the end of the policy year from which the insurance became effective.

The case of Mutual Life Ins. Co. v. Hurni Packing Co., 263 U. S. 167, 44 S. Ct. 90, 68 L. Ed. 235, 31 A. L. R. 102, cited in appellee's brief, is conclusive of this point. In that case the court held that it was competent for the parties to agree that the effective date

of the policy should be one prior to its actual execution and that that was what they did. A special provision of the application provided that the applicant by request might have the policy antedated for a period not to exceed six months. This provided for his insurance at the age of forty-seven. Under this agreement the policy was issued as of August 23 and the insurance became effective from its date of issue, although it was not actually applied for until September 2 and not executed and delivered until September 7. The court held, in effect, that, although not delivered until a later date, the policy went into effect on the date agreed to by the parties as the effective date and not upon the later date upon which it was actually delivered.

To the effect that an annual premium is intended to pay for one full year's insurance, see Davis v. Home Ins. Co., supra, and cases therein cited.

The case of McMaster v. New York Life Ins. Co., 183 U. S. 25, 22 S. Ct. 10, 16, 46 L. Ed. 64, is clearly in point and is controlling. In that case the applications, which were part of the policies, were dated December 12. The annual premium was fixed at $21, under the provision that on its payment and not before, the policies were to go into effect. The policies were issued on December 18, but not actually paid for until December 26, at which time the policies were delivered. While there is involved a question of fraud on the part of the agent by having inserted a provision that the policy should take effect on the same date as the application and that annual premiums should be paid on that date, the court held that the effective date of the policy was December 18, the date when the policy was actually approved and issued, and the court said:

"Taking all the provisions together, and granting that the words included December 12, 1894, nevertheless it would not follow that forfeiture could be availed of to cut short the thirteen months' immunity from December 18, 1893, as the premiums had already been paid up to December 18, 1894."

This shows conclusively that the mere fact of paying an annual premium in advance will not operate to penalize the insured by shortening the term of insurance to less than one year from the agreed date upon which the policy becomes effective and from which the policy year begins to run. The court was in error in sustaining the contrary view and must be reversed.

In view of this ruling a determination of the other issues becomes somewhat unnecessary and they will be discussed but briefly.

2. Application of the 1928 dividend.

Article 10 of the policy provides as follows:

"Dividends. This policy shall participate in profits, as apportioned by the Directors. Beginning at the end of the first policy year, provided the second year's premium is paid, dividends shall be declared annually during its continuance."

Article 11 provides as follows:

"Disposition of Dividends. Dividends may be withdrawn in cash; or applied to the payment of premiums; or applied to the purchase of paid-up participating additions to the policy; or left to accumulate with interest at three per cent., increased from surplus interest earnings as apportioned by the Directors, until the maturity of the policy, subject to withdrawal at any anniversary thereof.

"If the owner of this policy shall not exercise any other option the dividend shall be applied, on the expiry of the days of grace, to the purchase of paid-up additions, except that if the policy shall lapse the dividend shall be paid in cash.

"Paid-up additions are convertible into cash at any time at the request of the insured for amounts not less than the original dividends."

Neither of these articles provides the manner in which dividends shall be apportioned nor the manner in which options shall be exercised. Article 10 does provide that the dividends shall be declared annually at the end of the first policy year. Article 13 provides that after three full years' premiums have been paid the reserve value computed according to the American Experience Table of Mortality with interest may be used at the option of the owner in any one of four several ways. It further provides, "If, on failure to pay a premium, no option is exercised, such value shall be applied as provided in Option 1," and this option as set out in article 14 is as follows:

"Extended Insurance. Applied to the extension of this policy as participating term insurance from the date to which premiums have been paid, without any further payment. (Table 1). The value of any paid-up additions will be used to increase the term of extension."

From year to year the loan value of the policy had been increased by the building up of the policy reserve, and since the policy expressly stipulated that the dividend was payable at the end of the policy year, that is to say, November 7, this amount was available as part of the loan value of the policy. A significant fact is that the dividend in question was retained by the company for months without any offer to pay it in cash either before or after the expiration of the days of grace. Article 16 of the policy provides that in case of a loan or advances, failure to pay interest shall not avoid the policy until the total indebtedness and advances shall equal or exceed the loan value at the time of such failure. Whether we take the view that the dividend in question was used to increase the reserve of the policy or applied to extended term insurance, the result will be the same. It should be borne in mind also that at the time this dividend accrued the company held two policy lien notes, and even if the dividend should have been paid in cash, it was a creditor in possession with the right to apply the money to the reduction of the loan, and that it was its general duty to use whatever legal means were in reach to keep the policy alive. Certainly we think that the facts shown by the testimony are sufficient to require a submission of this question to the jury, even if we should hold that the dividend was payable in cash.

3. Application of the $40.00 remittance.

We have already referred to the facts controlling this transaction. While it is true that the assistant secretary of the company stated that the application of the $40 as a payment of interest on the loan was made by error, and while the negotiations up to the time of such application showed that it was held under instructions to be applied as a part of a scheme to reinstate the policy, it was not compulsory on the court or jury to adopt the testimony of the assistant secretary. Bearing in mind the obvious desire of appellant to keep the policy alive by whatever means were necessary and the obligation of the insurer to do so, if legally possible, and further bearing in mind the retention of the application and of this remittance after the receipt of the medical examiner's certificate without any notice being given of the rejection of the application for reinstatement, it might reasonably be assumed by the company that the applicant would acquiesce in such application. Certainly no objection has been made by the applicant, and we think it should have been left to the jury to determine whether the application was binding or not. Hartford Fire Ins. Co. v. Garvin et al., 136 S. C. 307, 133 S. E. 29.

Reversed.

SOPER, District Judge (dissenting).

In this case there is no suggestion or suspicion that the insured was misled or entrapped by the conduct of the insurance company or by obscurity of the insurance contract. The plain fact is that he stopped paying the premiums upon his ordinary life participating policy, and hence in due time, the policy necessarily lapsed and the obligations of the insurer came to an end. On December 6, 1928, more than six months before the insured died, the company wrote the first of eleven letters, addressed either to the insured or the beneficiary, urging the reinstatement of the lapsed policy. The insured was told that unless action to this end was taken, the policy would expire on June 16, 1929; so that long before the controversy arose or could have been foreseen, the company placed the same interpretation upon the policy for which it now contends.

Whether that interpretation was correct is the only substantial question in the case, and in its determination, the parties stand upon an equal footing before the court except in so far as there is occasion to apply the rule that if a policy of insurance is so framed as to leave room for two constructions, it should be interpreted in the sense unfavorable to the insurer. If, however, the meaning is clear, it is of no significance that it is against the interests of the policy holder. It was really a trivial matter in this case that the policy took effect sixteen days after the first premium was paid. Had the insured died before the contract was approved by the company, no recovery could have been had because no policy existed. But he knew this fact when he paid the money. Having survived the interval, there was some slight advantage in the earlier maturity of the loan values of the policy; but if there had been no compensating advantage, the case would have been the same. Judge Parker has pointed out in Sellars v. Continental Ins. Co. (C. C. A.) 30 F.(2d) 42, 45, where the policy was antedated to secure a lower rate and the insured got less than nine months' insurance for twelve months' premium, that it is immaterial which party gets the better bargain. He said: "All of these considerations, however, are beside the point. Courts cannot make contracts for parties. They can only enforce the contracts which the parties themselves have made."

The insured failed to pay the premium due October 22, 1928, on that day or within thirty-one days thereafter, so that upon the expiry of the period of grace, the policy lapsed and the rights of the insured thereunder came to an end with two qualifications: (1) The insured had the right to reinstate the policy at any time within three years on evidence of insurability and payment of the sums due the company with interest. He failed to do so and we have no concern with this feature on this branch of the case. (2) The insured had the right to extended insurance for a period of 237 days. The controverted question is whether this period should run from October 22, 1928, the anniversary date for the payment of premiums, or from November 7, 1928, the anniversary date of the approval of the policy; that is, until June 16, before the insured died on June 25, or until July 2d, after his death took place.

The reasons advanced for the later date are easily stated: (1) It is pointed out that a provision of the policy provides that it shall be incontestable after one year from date of issue, except for nonpayment of premium. It is too plain for argument that the date here intended is the anniversary of November 7, 1918, when the policy was approved. But this provision relates only to the feature of incontestability and has no reference to the term of extended insurance, or the date for the payment of premiums.

(2) The policy contains a provision that it shall take effect when approved, that is, on November 7th, and hence it is contended that that date is meant by the several expressions "the end of the policy year," "the anniversary of the policy," etc., which occur in various parts of the contract. Assuming for the moment that this is true, it does not follow that the extended insurance runs from this date. There is no statement in the policy that the term of extended insurance shall run from the end of the policy year. It is admitted that the failure to pay the second or third premium within a period of thirty-one days from October 22d would have voided and nullified the policy. It is also admitted that the failure to pay any subsequent premium within the same period of grace would cause the policy to lapse whereupon proof of insurability would be required for reinstatement. If these serious consequences are to be reckoned from October 22d, it is not possible to contend that it is contrary to the spirit of the policy to reckon the term of extended insurance from the earlier date, even if November 7th be the end of the policy year.

Indeed, one would expect, since the right to extended insurance arises only upon the lapse of the policy, to find that the term of extension should be reckoned from the same date as the lapse itself; and that such is the case is apparent from the terms of the policy. It is expressly said that when the policy lapses and no other option is exercised, the participating term insurance shall run "from the date to which premiums have been paid." Of course the policy might have provided that the payment of premium on October 22d of any year would pay up the policy until November 7th of the succeeding year; but the irresistible inference from the terms of the contract is that such a payment was intended to carry the policy only until the succeeding October 22d when the next premium would become due. The consequences of failure to pay the premium, viz., the voiding of the policy at the beginning of second and third years, and the lapsing in subsequent years, have been pointed out. The due date confessedly was October 22d, and the grace granted in the contract ran from that date. If the payment on any premium date kept the insurance in good standing until November 7th, the voiding or lapsing of the policy and the period of grace would have been measured from that date. Since they are not so reckoned, the only reasonable conclusion is that each premium carried the policy for one year from the 22d day of October.

Moreover, the same result is reached if it is considered that the case turns on the meaning of the terms "end of policy year" or "anniversary of the policy," for they also refer to October 22d. Thus it is provided that beginning at the end of the first policy year, if the second year's premium is paid, dividends shall be declared annually; and that dividends may be withdrawn in cash or applied to the payment of premiums or to the purchase of paid-up additions to the policy; and that if the policy holder does not exercise any other option within the period of grace, the dividend shall be applied to the purchase of paid up additions. These provisions clearly show that the dividend is available to the policy holder on the day when the premium is due; and in this case the parties so understood them, for dividends were declared by the company and used by the insured in aid of payment of premiums as of October 22d during the life of the policy.

If the conclusion is reached that the term of extended insurance expired before the insured died, the two additional minor grounds upon which the appellant relies present no

difficulties. The appellant contends that if either of two sums, to wit, (1) the sum of $33.48, representing a dividend which accrued on October 22, 1928, or (2) the sum of $40 sent by the beneficiary to the company on March 12, 1929, to be applied to the reinstatement of the policy, had been applied to the reduction of the loan, the term of extended insurance would have reached beyond the policy holder's death. The short answer is that the company did not so apply either sum, and was under no obligation to do so. The facts are that thirteen days after the expiration of the days of grace, to wit, on December 6, 1928, the agent of the company wrote to the insured calling attention to his failure to pay the premium on October 22d and urging him to take steps to reinstate the policy. He was told the amount of the net premium due on October 22d, after deducting the dividend of $33.48, and it was suggested, doubtless because such was the practice of the insurer, that the dividend might be used as part payment of the premium. The insured made no response. Three subsequent letters on the same subject were written him by the company in all of which he was urged to take steps to reinstate the policy. Finally, on March 12, 1929, the beneficiary of the policy sent to the company a check for $40 to be used with the dividend to reinstate the policy, and accordingly this matter was referred to the company's representative at Spartansburg, S. C. Considerable delay ensued, and again the company in a series of seven letters, extending from April 13, 1929, to June 13, 1929, urged the insured to take the necessary steps for medical examination and reinstatement of the policy before it was too late. Numerous references in these letters show beyond any possibility of dispute that it was the understanding of both parties that the company was to hold not only the dividend of $33.48, but also the additional cash sum of $40 and use them to reinstate the policy in full effect. The medical examination was finally held and the unfavorable report of the physician was mailed on June 15, 1927, and received by the company's representative at Spartansburg on the following day. It was sent by him on June 17th to the home office of the company in Cincinnati, Ohio, where in the ordinary course of the mail, it could not have been received until June 19th.

Thus it appears that the dividend was retained by the company for a particular purpose at the express direction of the insured; and that the term of extended insurance expired on June 16, 1929, through no fault of the company before it was ascertained that the purpose could not be effected. On June 25, 1929, the insured died, and shortly thereafter, the beneficiary was requested to furnish evidence of the appointment of a representative of the estate so that the company might pay him the dividend. These facts preclude the inference that the company used or should have used the dividend to lengthen the term of extended insurance.

Nor is there any reasonable ground to believe that the sum of $40 was applied by the company to the payment of the interest on the loan. The basis of the contention is a letter of June 24, 1919, from an official in the home office to the insured stating that the remittance of $40 had been applied to the interest on the loan. The occasion for the letter was the fact that an indebtedness was due by the insured on June 26th. The insured died on June 25th, and the letter in the course of the mail did not reach his home until after his death. Confining its attention to these facts, a jury might well have held that the money had been so applied. But other uncontradicted evidence shows that the letter was written in mistake by one who did not know that the policy had expired; and when we also take into consideration that another department of the company had already been informed that the policy holder was no longer an insurable risk, we are compelled to believe that the company did not knowingly divert the money from the authorized purpose, and use it to revive a policy already dead. Had a jury decided otherwise, the verdict would necessarily have been set aside. Hence there was no issue for its determination.

The rulings of the District Judge seem to have been correct in all respects.