ÆTNA LIFE INS. CO. v. DUNN.

(Circuit Court of Appeals, Eighth Circuit. May 11, 1905.)

No. 2,078.

1. ACCIDENT POLICY—INJURY SUSTAINED IN A GIVEN OCCUPATION.

Where a party obtains a policy of insurance against injury by accident, specifying the occupation of the assured to be that of a druggist, deemed to be a select risk, and that of a farmer or supervising farmer only is specified as a more hazardous risk, calling for a larger premium, and thereafter the drug store of the assured was destroyed by fire, whereupon the assured moved upon a tract of land entered as a homestead, into a house built by him thereon, which he thereafter occupied with his family as his home, and superintended the construction of a barn thereon, and caused to be fenced and broken and cultivated 40 acres of the land thereof, under his supervision, for a period of six months; and

was preparing for further cultivation of the land at the time of his injury, and for eight months prior to such injury had no connection with the business of a druggist, his occupation was that of a supervising farmer, and not that of a druggist, within the meaning of the policy.

[Ed. Note.—Accident insurance, risks, and causes of loss, see note to National Acc. Soc. v. Dolph, 38 C. C. A. 3.]

**2. SAME—OCCUPATION.**

The term "occupation," as employed in the policy, implies simply that which at the time of the accident constitutes the assured's principal business or pursuit; that which engages his attention and time, as destinguished from that which is incidentally connected with the life of men in any or all occupations.

**3. SAME—CONTINUANCE.**

The fact that the assured for some time after the destruction of his drug store was engaged in proving and collecting a claim for loss under a policy of insurance on the drugs, and from time to time attended to the collection of accounts connected therewith, and entertained the purpose to resume the business of a druggist after he had made sufficient improvement on and had occupied his homestead for a sufficient length of time to enable him to sell his homestead right, did not have the effect to continue during such time his occupation as a druggist, or affect the designation of his occupation as that of a supervising farmer only.

**4. SAME—ABANDONMENT.**

The correct test in such cases is not so much as to whether the assured had in fact abandoned the occupation stated in the application and policy, but whether or not at the time of his injury he was in fact engaged in another occupation, not merely incidental, but as a business, of a more hazardous classification.

(Syllabus by the Court.)

In Error to the Circuit Court of the United States for the District of Nebraska.

Arthur W. Lane (Halleck F. Rose, on the brief), for plaintiff in error.

A. S. Tibbets (W. L. Anderson, on the brief), for defendant in error.

Before SANBORN and VAN DEVANTER, Circuit Judges, and PHILIPS, District Judge.

PHILIPS, District Judge. This is an action on an insurance policy known as a "Twentieth Century Combination Accident Policy," issued by the Ætna Life Insurance Company of Hartford, Conn., on the 9th day of December, 1901, in favor of William Henry Harrison Dunn. In the month of May, 1901, said Dunn was engaged in business as a druggist at the town of Mangum, in the territory of Oklahoma, when he made application to the insurance company for said policy. In his application he stated that he was a druggist, not chemist by occupation, and that as such he desired to be placed in the classification designated as "select," which occupation was deemed less hazardous, and required the payment of a less premium, than one engaged in the occupation of a farmer or a supervising farmer only. The policy was accordingly issued for a period of three months, covering the specified accidents. In case of death occurring within the terms covered by the policy, the

amount of recovery was to be $5,000. The policy contained the following provision:

"The policy is issued and accepted subject to the following conditions: * * * If the insured is injured in any occupation or exposure classed by this Company higher than the premium paid for this policy covers, the principal sum insured and weekly indemnity shall be only such amounts as said premium will purchase at the rate fixed for such increased hazard."

Within a short time thereafter, in the same month, the drug store of the assured was destroyed by fire. On the 26th day of September, 1902, the assured received an injury by being thrown from his buggy, which resulted in his death the next day thereafter. His widow, the defendant in error, as the beneficiary, brought suit on the policy to recover the full amount of $5,000.

The defense interposed to this action is that at the time of the accident the occupation of the assured was not that of a druggist, and had not been for six months or more previous thereto, but that in the preceding spring he had taken up the occupation of a farmer or supervising farmer only, in which business he was engaged at the time of the injury, which occupation at the time of the application and issue of the policy was classified as "hazardous," and not as "select," and called for a higher rate of premium than that of a druggist; and therefore said change in occupation, according to the contract, increased the hazard, and entitled the claimant, under the proper classification, to recover not exceeding the sum of $1,562.50. It is conceded, however, by plaintiff in error that under the proofs the defendant in error is entitled to recover the sum of $2,500. On a trial to a jury the plaintiff below recovered judgment for the full sum of $5,000, with interest.

The question to be decided is whether or not, on the whole evidence, the trial court should have instructed the jury that the plaintiff below was not entitled to receive the sum of $5,000 under the policy. The answer to this involves the question of fact, as affected by rules of law, whether or not at the time of the accident the occupation of the assured was that of a druggist, or of a farmer or supervising farmer only. The court below treated this question as one for the determination of the jury. If, however, all the essential facts give but one reasonable, sensible character to the assured's occupation at the time of his injury, the plain office of the court was to declare what that occupation was, and direct judgment accordingly.

The evidence shows that some years prior to 1900 the assured resided in the state of Nebraska, engaged in the superintendency of a large farm, of about 2,000 acres, owned by his brother. Thereafter he conducted a drug store in northeast Missouri. In May, 1901, he opened a drug store at Mangum, in the territory of Oklahoma, which he conducted until it was burned the 8th day of December, 1901. Between that time and his death, about September 27, 1902, he neither owned nor conducted a drug store or dealt in drugs. He was occupied more or less constantly between one and two months after the loss of his drug store in settling up the business connected therewith, and from time to time thereafter gave attention to the

matter of collecting some scattered accounts growing out of the business of said drug store. As that store was not run over six months, in a small country town, in a newly opened territory, the number and amount of such accounts, it may reasonably be presumed, were not large. He also gave attention after the fire to making proofs of loss under the policy of insurance covering his drugs, and adjusting the claim. In August, 1901, he had, by lot, acquired the right to enter for homestead purposes 160 acres of land in said territory, which he located about 20 miles from Mangum. He began in the early part of 1902 the erection of a dwelling house on said land, into which he moved with his wife, who constituted his family, in February, 1902. He then removed from northeast Missouri, his former home, a lot of horses to this homestead. Except one used by him to ride and drive, the horses were claimed by the wife as her separate property. But he looked after them in the pasture as if his own; either watering them himself, or having it done, salting them, and occasionally feeding them with corn or kaffir raised on the farm. He had fenced about 40 acres of this land, and, under his direction, caused to be cultivated thereon corn and kaffir. In the spring of 1902 he built a barn on this land. While he had this work done under contract, and part by day labor, he assisted a little about the work and superintended it, just as any other supervising farmer would have done. From February, 1902, to the day of his death, he and his wife occupied the house on this homestead, and had no other home. On the very day he met with his fatal accident, he was engaged in driving about in his buggy, from which he was thrown by his vicious horse, to see about obtaining men and machinery to put in a crop of wheat on the farm, and to get a man to attend to the horses on the farm while he was absent on a contemplated trip for the next day or so.

The defendant in error, before this suit was brought, in letters written to the adjusting agent of the plaintiff in error, stated that:

"My husband, Mr. Dunn, was by profession a druggist. While in the drug business in Mangum, Okla., he drew a very fine claim when this country was thrown open to settlement. When fire destroyed the building in which his drug store was located, Mr. Dunn decided that he would prove up on his claim, and sell it before again opening up a drug store, as the town of Lone Wolf did not offer a good opening for a store, and at the same time he could not prove up on his claim here until November 1st. * * * My husband did not keep a hired hand all the time, as the work did not require it, but when it did then he employed help. * * * The afternoon of the day of the accident Mr. Dunn was making arrangements for putting in his fall wheat. Together we drove to a farmhouse to see about renting some machinery for putting in the wheat. Then we drove to Lone Wolf to get our mail, and then home again. At the house I got out of the buggy and Mr. Dunn was going to drive on to a farmhouse where a gentleman lived whom Mr. Dunn often hired to assist in our work."

In her testimony at the trial she stated that:

"On the 25th of September Dr. Dunn and I lived on a claim in Oklahoma. It was a government claim. He had lived there from the 25th of February up to the time of his death, on the 26th of September. * * * Prior to the time that we moved out on the claim near Lone Wolf, the store was destroyed by fire. That occurred the 8th of December. During the remainder

of the time that he was in Mangum after the destruction of the drug store by fire, the doctor was settling up his business, as far as he could, with the insurance company, and his indebtedness, and getting ready to take possession of his claim; getting so that we could live on it. * * * At the time we moved out on it, in the latter part of February, 1902, there was no improvement on it at all, except what we put on ourselves. We built a house and put some fencing on it; did what the law required. * * * I think there was about forty acres broken upon the place at the time of the doctor's death. * * * A part of this forty acres was planted in sod corn, and there was some kaffir corn, I believe. After we moved to this place on the claim, Dr. Dunn watched over the work, and directed what he wanted done. He had no machinery of his own, and no horses that were broken, and all work done he had to hire done. He was doing very little, if anything."

Further on she said:

"When he was on the farm his principal occupation was looking after the affairs of the farm. He looked after it. He didn't do the work himself. I looked after a good deal of it, too."

The only matters relied upon by her to parry the force of these designating facts are that during the time they occupied this homestead her husband looked after the collection of the insurance claim and his accounts, writing letters, and going to the post office, and his declarations to her that it was his purpose, after he had made the required proofs to establish his homestead right and could sell it, to resume the drug business, if a suitable location could be had, coupled with the fact that at one time, while they were returning from a visit to Missouri, he made some inquiry about a place near Newton, Kan., as to its suitability for the drug business.

The term "occupation," as employed in the policy, implies simply that which at the time of the accident giving the cause of action constituted the assured's principal business or pursuit; that which engaged his attention and time, as distinguished from that which is incidentally connected with the life of men in any or all occupations. Was the assured engaged in the business of a druggist at the time of the accident, when he had not conducted a drug store or had anything to do with one for eight months? Was he still a druggist because now and then he sought to collect some outstanding accounts connected with the former business? Was he engaged in the occupation of a druggist because he harbored in his mind a desire or purpose at some time in the future to resume such business, dependent upon several conditions, which would enable him to engage therein at some indefinite time and at some unascertained place? The very questions suggest answers in the negative.

Suppose, on the other hand, that this defendant in error were seeking to recover on this policy, with the conditions reversed, on the ground that her husband, at the time of his injury, was engaged in the occupation of a supervising farmer; could any court or jury hesitate to say, on the evidence in this record, that she was entitled to recover? He had not owned or conducted a drug store for eight months, and within the six months preceding his death he had founded a home on a tract of land claimed as a homestead. There he had lived as the head of a family; there he built the barn to shelter their stock, erected or caused to be erected fences, broke or

caused to be broken the wild land, and subjected it to the uses of husbandry, and was arranging for still further extension of his agricultural pursuits by sowing a crop of wheat, which, in its nature, would not be garnered before the next season. Separate from this visible, constant occupation any information of the fact that eight months prior thereto he had been engaged at a town 20 miles distant in the business of a druggist, would any neighbor who saw him living in that home, erecting a barn and fences, with fields planted and cultivated, and making preparation for further extension of his agricultural operations, just as any other settler, arrive at any other conclusion than that his occupation, as that of any other granger in Oklahoma, was that of a farmer or supervising farmer only? His collection now and then of accounts growing out of a former drug business and settling up an insurance loss thereon, must be regarded as merely incidental to the life of any business man, in no degree altering or interrupting his visible, established agricultural pursuit.

The authorities cited in behalf of defendant in error do but illustrate the common vice of a failure to discriminate between the facts of the case made and extraneous facts used for illustration. The case of Stone v. United States Cas. Co., 34 N. J. Law, 371, was that of a person insured as a school-teacher, and while temporarily out of employment as such, let a contract for two buildings on his premises, and while overlooking the work he fell from the building and was killed. He had not changed his occupation for another, and was only overlooking the construction of a building—a thing incidental to any man of affairs, which in no degree suspended his regular occupation, any more than if during "school days" he had gone out to look over the work being done for him.

The case of Johnson v. London Guarantee & Accident Co., 115 Mich. 86, 72 N. W. 1115, 40 L. R. A. 440, 49 Am. St. Rep. 549, is of a like class. In the application the assured had represented that he was engaged in the business or occupation of secretary and treasurer of Hull Bros. Company, grocers, under the classification "select," and the policy contained the same language. At the time of the application, and until the accident, he resided on his farm. The policy provided that, if injured while engaged in work or duty classed as more hazardous than his stated occupation, he should be entitled to recover only such amount as the premium paid would purchase at the rates fixed for such increased hazard. The policy was twice renewed. He had a contract with said Hull Bros. for employment, which did not expire until some time after the injury, and received a salary up to a week before the accident, but was not receiving any salary at the time, because there was no money. A part of his business was raising cattle on the farm, and he kept a bull. Seeing one day the bull break through a fence into a pasture kept for calves, he undertook to drive him out, when the bull turned upon and injured him. He engaged in no actual work of farming. In that case there was not even a request made by the defendant for the direction of a verdict for the defendant. Both parties tried the case upon the theory that it was a question for the jury. The only question was

whether he was engaged in the occupation of a farmer, and nothing more. The court held that merely living upon the farm, carried on through others, did not make him a farmer, within the meaning of the term. There was not even in the case the question of his being engaged in the occupation of a supervising farmer.

In Fox v. Masons' Fraternal, etc., Ass'n, 96 Wis. 390, 71 N. W. 363, the occupation of the assured was represented to be that of a mill owner, overseeing only. At the time of the injury he was superintending a small portable sawmill, temporarily located in the woods for the purpose of cutting logs into lumber for use in a planing mill owned by him. It was held that such occupation did not, as matter of law, make it other than that of a mill owner, overseeing only, or place him in the classification including the more hazardous occupation of "a lumberman in the woods." After the policy was issued he notified the company that he had changed his occupation to that of a part owner in a sawmill at Big Falls, and that his duties would be generally supervising the business, which would require him to be around the mill, lumber yard, office, and store. Afterwards he notified the insurance company of another change in his occupation, to the effect that he had changed his residence to another place, where he was associated with another party, as owner, in the operation of a planing mill, dealing in lumber, sawing, etc.; that his duties would consist of supervising the yard and mill, with a probability that he might necessarily, for an hour or two, from time to time, be required to operate some of the machinery, which was consented to by the insurer. While so engaged he went into the woods to look after the progress of their operations, and attempted with an ax to cut away a tree top that interfered with getting to some logs, and, in so doing, cut his foot. The court in that case said that it did not change his occupation; that the evidence sufficiently sustained the finding that the party was a mill owner, superintending only; that a sawmill is such, whether great or small; that neither its size nor the place of its location determined its character; that a mill in a settled community obviously does not change its character because located in the timber, at a distance from town or village. The court further said that, under that policy, acts and exposures were not classified, but only occupations. It was held that a particular exposure, under such contract of insurance, though not in pursuit of it and as part of it, did not affect the business or occupation mentioned in the certificate, and that as his occupation when injured was that of a mill owner, overseeing only, it came clearly within the terms of the written contract.

The correct test in these cases is not so much as to whether the assured had in fact abandoned the occupation stated in his application and policy, but whether or not at the time of his injury he was in fact engaged in another occupation, not merely incidental, but as a business, of a more hazardous classification. In Standard Life & Accident Ins. Co. v. Taylor, 12 Tex. Civ. App. 387, 34 S. W. 781, the application and the policy stated the occupation of the assured as that of a blacksmith. The evidence showed that at the date of

the application, and continuously thereafter, the assured also acted as switchman and car coupler—an occupation classed as more hazardous than that of blacksmithing—and that he received his injuries while coupling cars. It was held that recovery could only be had according to the increased hazard, and that the charge given by the trial court was incorrect, "in requiring, in order to reduce the recovery, not only that the insured should have engaged in a more hazardous occupation, but that he should have quit that of blacksmith. But regardless of this, it was a part of the regular employment of the deceased to do just such acts as that which he was doing when he was killed. When he stated that his occupation was that of blacksmith, he did not 'fully describe' all of his occupations. And when he continued to couple and uncouple cars, he only continued to perform duties which his employment imposed upon him. Unquestionably, he was engaged, when killed, in an occupation classed as more hazardous than that mentioned in the policy, and, by the terms of the contract, his beneficiary was entitled only to the sum allowed for risks in that class." So that if, at the time Dr. Dunn made his application for and took out his policy of insurance, he had been regularly engaged in supervising a farm, which occupied most of his time and his attention, and he received his injury while engaged therein, he would not have been entitled to recover the full amount of the select policy as a druggist. Loesch v. Union C. & S. Co., 176 Mo. 655, 75 S. W. 621.

In National Accident Society v. Taylor, 42 Ill. App. 97, the assured was classified as a supervising farmer, with the specification that for an injury sustained while doing any act or thing pertaining to any occupation, or exposure classed as more hazardous than that, he or his beneficiary would be entitled to recover only such amount as the society pays for such increased hazard. Among the specifications more hazardous was that of pile driver. While the assured was engaged in repairing a private bridge on his farm, in driving a post in the bed of a stream, by means of an ax and sledge, he met with an accident which caused his death by drowning. The evidence showed that the assured occasionally did odd jobs about the farm, such as salting cattle, feeding stock, mowing out fence corners, righting up gates, fences, and the like, when out of repair; and that he superintended his farm. It was contended that the supervision of a farm meant overseeing, inspecting, and directing, merely, without any personal action or manual labor. The court held that:

"The supervision of a farm includes in its care and oversight the doing of such incidental things as may be required for keeping it in order, and does not mean absolute idleness, as far as physical labor is concerned."

The court further said that:

"A pile driver is a machine for driving piles by raising, by means of power applied to the machinery, a heavy weight, and dropping it upon the pile. It is manifest that one who drives a post by means of an ax or sledge is not engaged in the occupation of a pile driver. Besides, there was no change of occupation or business on account of this act of repairing the bridge. He had not gone into the bridge business."

It would follow, however, that if such a supervising farmer had entirely abandoned his farm for eight months, and for six months had engaged in the independent business of building bridges, and received an injury while engaged therein, he would not have been engaged in the occupation of a supervising farmer when he received such injury.

On the evidence in this case the court should have directed the jury, as requested by defendant below, that the plaintiff was not entitled to recover the sum of $5,000, but "only such amount as said premium (which was paid) would purchase at the rate fixed for such increased hazard," which the plaintiff in error concedes to have been $2,500.

It results that the judgment of the Circuit Court must be reversed, and the cause remanded, with directions for further proceedings in conformity with this opinion.