**GENERAL ACCIDENT, FIRE & LIFE ASSUR. CORPORATION, LIMITED, OF PERTH, SCOTLAND, v. BRINN & JENSEN CO.**

No. 9586.

Circuit Court of Appeals, Eighth Circuit.
April 17, 1933.

Before STONE, VAN VALKEN-
BURGH, and BOOTH, Circuit Judges.

BOOTH, Circuit Judge.

This is an appeal from a judgment on a directed verdict in favor of appellee, plaintiff below, in an action on a policy of accident insurance covering Harry Hamilton Jones, who was vice president and secretary of the plaintiff company. The company was beneficiary under the policy.

Mr. Jones lost his life in the building occupied by his company on July 3, 1929, when a quantity of fireworks, which were in the building, exploded, and the building burned.

The policy of insurance and the application therefor, which was made part of the policy, are, so far as here material, set out in the margin.[1]

---

[1] "General Accident Fire and Life Assurance Corporation, Ltd., of Perth, Scotland. * * *

"In Consideration of the statements in the application for this Policy, a copy of which application is endorsed hereon and made a part hereof, and of Twenty-Five and no/100 ($25.00) Dollars premium,

"Does Hereby Insure Harry Hamilton Jones of Omaha, Nebraska, herein called the Insured, by occupation a Vice President & Secretary and classified by the Corporation as a A-1 risk, for Twelve months, beginning at noon, Standard Time, at the place of counter signature hereof, on the fifteenth day of January, 1922, subject to the provisions and limitations hereinafter expressed, against loss resulting solely from Bodily Injuries, effected directly and independently of all other causes, through accidental means (excluding suicide, sane or insane, or any attempt thereat, sane or insane), as herein provided. * * *

"The Principal Sum of this Policy is $7500.00. * * *

"Payments in One Sum for Loss of
"Life ———— The Principal Sum. * * *
 "Double Indemnity.
"Part III.
"Any amount which may become payable under Parts I, and II, shall be double the amount specified therein if such injuries are sustained * * * (4) by the burning of a building providing the Insured is therein at the Commencement of the fire; * * *

 "Standard Provisions.
"1. This policy includes the endorsements and attached papers, if any, and contains the entire contract of insurance except as it may be modified by the Corporation's classification of risks and premium rates in the event that the insured is injured after having changed his occupation to one classified by the Corporation as more hazardous than that stated in the policy, or while he is doing any act or thing pertaining to any occupation so classified, except ordinary duties about his residence or while engaged in recreation, in which event the Corporation will pay only such portion of the indemnities provided in the policy as the premiums paid would have purchased at the rate but within the limits so fixed by the Corporation for such more hazardous occupation. * * *

"No agent has authority to change this policy or to waive any of its provisions. No change in this policy shall be valid unless approved by an executive officer of the Corporation and such approval be endorsed hereon. * * *

"23. The copy of application endorsed hereon is hereby made a part of this contract. No provision

Yale C. Holland, of Omaha, Neb. (J. A. C. Kennedy and G. L. DeLacy, both of Omaha, Neb., on the brief), for appellant.

H. C. De Lamatre, of Omaha, Neb., for appellee.

The action included a claim for the double indemnity provided in the policy, the complaint, as amended, alleging:

"That, on the 3rd day of July, A. D. 1929, the said Harry Hamilton Jones was accidentally burned to death and died, in a burning building that had been used and occupied by him and his associates as their place of business, and in which said building he was therein at the commencement of the fire, and his death was sustained by reason of the burning of said building." ·

The amended answer set up various defenses, among them: (1) False representations by Mr. Jones as to his occupation and the duties thereof; (2) that his death was not caused by the burning of the building but by the explosion of fireworks; (3) that Mr. Jones was injured and lost his life while doing acts and things pertaining to an occupation classified by the insurance company as more hazardous than that stated in the application and the policy, and that the amount of insurance was, accordingly, reduced to the limit fixed by the insurance company in its manual of classification for such more hazardous occupation.

The reply denied any false representations by the insured; denied that insured, at the time of his death, was engaged in any occupation different from that described in and contemplated by the policy; alleged that the insurance company fully knew the occupation and duties of the insured; that the insurance company had waived any right to contest the policy or the classification of the insured as to occupation and the duties thereof, and was estopped to deny that the classification of insured in the policy was correct.

of the charter or by-laws of the Corporation shall be used in defense of any claims arising under this policy. Full compliance on the part of the Insured and Beneficiary with all the provisions of this policy is a condition precedent to recovery hereunder, and any failure in this respect shall forfeit to the Corporation all the right to any indemnity. * * *

"Copy of 'Application to
General Accident Fire And Life Assurance Corporation, Ltd.' * * *

"5. Of What firm are you a member or employee? Brinn & Jensen Co.

"6. Kind of Business? Wholesale paper, stationery and notions. Address 1112 Harney Street, Omaha, Nebraska.

"7. What is your occupation and the full duties thereof? Vice President and Secretary. Office and traveling duties only. * * *

"21. Do you agree that the falsity of any statement in this application shall bar the right to recovery, if such false statement is made with intent to deceive, or materially affects either the acceptance of the risk or the hazard assumed by the Corporation? Yes."

Some of the facts are not in dispute: that the policy was duly issued and the premiums paid; that the policy was in effect at the time of the death of the insured; that the death was caused by violent, external, accidental means; that the insured was in the building where he met his death at the time the fire started therein.

At the close of all the evidence, the defendant requested the court to instruct the jury that the evidence was insufficient to warrant a finding that said insured came to his death by reason of the burning of the building, and that, therefore, in no event could the verdict exceed the sum of $7,500; also in event this request be refused, that the court instruct the jury that the verdict could not in any event exceed the sum of $7,500 unless the jury should find that the burning of the building was the cause of the death of the insured. These requests were refused.

The defendant also requested the court to instruct the jury that at the time the insured met his death, he was engaged in doing an act or thing pertaining to an occupation classified by the insurance company as more hazardous than the occupation named in the policy, and that, therefore, the verdict could not in any event exceed the sum of $1,000; also in event this instruction was refused, that the court submit to the jury the question whether or not the insured came to his death while engaged in performing an act or thing pertaining to an occupation classified as more hazardous by the insurance company.

These requests were also refused.

Thereupon, under the direction of the court, the jury returned a verdict for the plaintiff in the sum of $17,485, and judgment was entered thereon.

Two broad questions are raised on this appeal: (1) Whether the evidence was conclusive that the insured came to his death by reason of the burning of the building; (2) whether there was substantial evidence which would warrant the jury in finding that the insured, at the time he met his death, was engaged in performing an act or thing pertaining to an occupation classified by the insurance company as more hazardous than the occupation named in the policy and the application.

### Cause of Death.

There was evidence tending to show that the plaintiff company was a wholesale paper concern and as a part of its business dealt in fireworks. These fireworks were kept on the fourth floor of the building. On July

3, 1929, Mr. Jones was on the fourth floor in close proximity to the fireworks at the time of the catastrophe. The general layout of the fourth floor is roughly shown on the accompanying sketch found at page 93 of the Transcript. The bins in which the fireworks nor those which followed were terrific enough to shake the building. The aisle through which Foll ran in escaping was formed of boxes piled 5 or 6 feet high containing fireworks. While standing on the window ledge, Foll saw flames coming out of the windows.

Merchandise on 4th floor -1112 Harney St.
July-3-1929.

Note! On overhead rafters, were stored all old order sheets, invoices, record books, sample cases etc.

Plaintiff's Exhibit 3
CWP

were kept were mostly in the south half of the room. They were made of three-eighths inch lumber. There was a double deck of these bins in each row. The bins opened to the aisle. One of the employees of the firm (Myron Jensen) was working on a set piece of fireworks at about the point marked x. The insured was last seen shortly before the catastrophe at about the point marked y.

William Foll (not an employee), a friend of Jensen who was near him at the time of the catastrophe, testified that Jensen was in the space at the south end of the room and about 5 or 6 feet from the south end; that he was on his knees nailing fireworks on a framework. An employee, Bryson, was about 15 feet back from Jensen but in the same aisle. Foll said "Hello" to Jensen, then turned to sit on a box when an explosion occurred. The set piece on which Jensen was working exploded first. Foll ran to the fire door through which he had entered, and thence to the north end of the east room. He opened a window and stood on the ledge until rescued. His hair and the cuffs on his trousers were singed. After running a few feet, Foll turned and looked back for Jensen. He did not see him. He saw no flames but lots of smoke. There was a "din of exploding fireworks." Neither the first explosion

Robert Miller, an employee, testified that he was about 20 feet north of the set piece when it went off. He saw it "going off in all directions" and he ran to the fire escape on the north end of the building. He looked back but could not see any fire; he saw just a lot of black smoke. He heard loud explosions while he was going down the fire escape. The aisle between the rows of bins was about 4 feet wide. A few minutes after escaping from the building, the witness went around to the front of the building (the south end). Flames were then coming out of the windows and the fireworks were still exploding. A stairway led from near the southwest corner of the room to the third floor. Some of the shells are about 5 inches in diameter and 7 inches high. They are fired into the air from a steel mortar and they burst in the air. The witness saw Mr. Jones, about five minutes before the explosion, talking to Mr. Vickery in the east room on the fourth floor. Before that, Mr. Jones had been checking over orders for fireworks in the west room where the fireworks were. The witness would say, after looking at his signed statement, that he probably saw Mr. Jones go back to the west room where the fireworks were, after talking to Mr. Vickery.

When the set piece went off, it was lean-

ing in an upright position against the bins to the west. Sparks went off fan shape all over the end of the room. There were 15 or 20 of the shells on the floor near Jensen when the set piece went off. These might go off if fire burned away the paper and got to the fuses.

Mr. Moore, city salesman for the company, testified that shortly before the accident he had occasion to go to the fourth floor by way of the stairway which opens into the fourth floor near the southwest corner. He found Mr. Jones in the west aisle not far from the stairway and about 15 feet south from the north end of the building. The witness asked Mr. Jones where certain balloons were, got them, and returned downstairs. Mr. Jones had some papers, which the witness thought were order slips, in his hands, but the witness could not say whether he was working in the fireworks at the time. When the witness reached the first floor on his return, he heard the sound of glass falling on the sidewalk. Then he heard the different pieces. It sounded like one shell after another exploding. The witness had seen Mr. Jones a minute or two before he heard the sound of falling glass.

L. M. Jensen, an employee of the company, testified that the aerial bombs were the most powerful fireworks which the company carried. There were 50 or 75 of them in the bins on either side of the west aisle at the time of the accident.

Carl Nelson, an employee of the company, testified that he was going down from the fourth floor on one of the elevators at the time of the accident. He heard one or two small explosions and then a large one. This came before he got to the third floor.

Fred W. Snow, an employee of the company, testified that he was on the main floor. He heard a rumble and saw bricks falling down into the street.

Bernard Bryson, not an employee, testified that he was about 10 or 15 feet north of Myron Jensen when the accident happened. He had been helping him on the set piece. Rockets and night shells were on the floor near Jensen not covered up. "There was a swish and then a report and I started running north." The witness followed Miller out of the window on the north side of the building and down the fire escape. He heard reports as he ran—some like night shells, some not so loud.

Fred A. Morgan, an employee of the company, testified that he had just come down from the fourth floor to the first floor on the elevator. He left Mr. Jones on the fourth floor with papers in his hands working on an exhibit. He was "putting on the time." He further testified:

"In shooting off an exhibition we shoot off rockets and then bombs and night shells and also day shells and each one that fires them has a carbon copy to work with. It is necessary for somebody to arrange the order in which the various pieces will be shot off. The pieces themselves are marked with a pencil, that is, the time of firing is marked on them. So by following different times that are marked on the pieces of fireworks the fellow who is shooting them off will know which to take first. * * *

"Harry Jones was the man in our organization who determined the order in which these various pieces making up an exhibition should be fired off. Mr. Jones would superintend the putting on of the exhibition and one or more men would work under him and do the firing. He would be there to see that everything went on correctly.

" * * * He didn't plan to superintend any exhibitions that year, 1929, except making up the firing schedule."

C. M. Westergard, an employee of the company, testified that he saw Mr. Jones about a minute before the accident, in the west aisle at the south end of the building with some order sheets in his hands. He was looking at some fireworks in a bin. Mr. Jones was in the aisle when the witness heard the first report. The witness saw a man running down the east aisle and started to see what the trouble was; he saw that "some of these railroad fusees had been set off." There was an explosion and the room was filled with smoke. Then there was another explosion. The smoke and heat got so bad that the witness could not stay. He went to the elevator and down. This elevator was on the west side of the room.

The foregoing witnesses were in the building when the catastrophe took place.

Firemen who responded to the fire call testified that after the fire the two bodies (Mr. Jones and Myron Jensen) were found on the third floor, one about 10 feet northwest of the fire door, the other a few feet southwest of the same door. The rear part of the fourth floor was still standing; the rest of the floor had burned and fallen to the third floor. Part of the roof had also fallen in.

Firemen who, at the time of the accident, were at their engine house two blocks away testified that the first noise they heard sound-

ed like a building was falling down. They had not yet received the fire alarm.

The Western Union branch manager several blocks away at the time heard the explosion and saw bricks flying up into the air and a cloud of black smoke.

When the body of Mr. Jones was found, both legs and one arm had been severed from the body. Dr. Marble testified that in his opinion this severance had not been caused by burning.

Mr. W. H. Dorrance, the undertaker, was also of the opinion that the limbs had not been severed by burning; also that they had not been severed by an explosion. This latter conclusion was contrary to the conclusion reached by Mr. Dorrance in a signed statement made by him shortly after the accident.

Witnesses Donald Fielding and Florence Lewis testified that the first explosion was the loudest.

W. E. Priestley, a manufacturer of fireworks, testified that a man standing next to a bin of bombs might be killed if they exploded; also that the gases from burning fireworks, if in sufficient quantity, would produce death.

In view of this evidence tending to show that of the six men who were on the fourth floor at the time of the accident, four escaped without being burned; three of these four ran nearly the length of the building in making their escape; that Mr. Jones who was within a few feet of the stairway, one of the ways of exit, failed to escape; in view also of the evidence tending to show that one of the earliest explosions was of violent character; in view also of the evidence tending to show that Mr. Jones, when last seen, was in close proximity to the most powerful of the explosive fireworks; in view also of the evidence tending to prove that these more powerful explosives such as the bombs were capable of producing serious injury and perhaps death to one standing close by at the time of their explosion; in view also of the evidence as to the dismembered condition of the body of Mr. Jones when found and that such dismemberment was not produced by fire, we think it cannot be held as a matter of law that Mr. Jones came to his death by reason of the burning building; defendant was entitled to have the question submitted to the jury. The burden of proof rested upon the plaintiff.

The fact that the body of Mr. Jones was found after the fire about midway of the building on the third floor, while perhaps tending to show that he had succeeded in get-

ting away from the place where he was last seen and was probably not killed by an explosion, is not, we think, of decisive importance when it is remembered that the evidence shows that the fourth floor had collapsed and what remained on it was precipitated in a confused mass to the floor below.

### Increased Hazard.

As to the other question relating to the occupation of Mr. Jones, the contention of the appellant is that even though it were found as a fact that the death of Mr. Jones was caused by the burning of the building, yet in view of the evidence as to what Mr. Jones was doing at the time of the accident and in view of the provisions of the policy of insurance, and in view of the provisions of the Nebraska statute, there could be recovery of a limited amount only and much smaller than $7,500. The indemnity clause relating to increased hazard has been heretofore set out in the margin. The relevant Nebraska statute reads as follows:

"No policy of insurance against loss or damage from disease or by bodily injury by accident, or both, of the assured, shall be issued or delivered in this state * * * unless it contains in substance the following provisions: * * * 6. A provision that if the insured is injured or contracts disease after having changed his occupation to one classified by the company as more hazardous than that stated in the policy, or while he is doing any act pertaining to any occupation so classified, the company shall pay such proportion of the indemnities provided in the policy as the premium paid would have purchased at the rate, but within the limit fixed by the company, for such more hazardous occupation according to the company's rates and classification of risks filed with the department of trade and commerce in this state, at or prior to the date of issuance of the policy under which indemnity is claimed." Section 44-604, Compiled Statutes of Nebraska 1929.

Defendant's manual of risks and occupations on file with the Department of Trade and Commerce of the state of Nebraska at the time the policy was written contains the following:

| "Occupation, Exposure or Hazard | Class | Limit of Risks |
|---|---|---|
| "Fireworks Exhibitor | 7 Ex. Hax | 1000 " |
| "Fireworks Maker (not insurable) | X Ex. Peril | 500 |
| * * * * | * * * | * * |
| "Dynamite Maker, handler, user or custodian of (not insurable) | X (Ex. Peril.) | 500 |

974

"Explosives, maker or
custodian of (not
insurable) X (Ex. Peril.) 500
"Powder maker, user,
handler, manufac-
turer or custodian
of (not insurable) X (Ex. Peril.) 500
* * * * * * * * *

"Any employment, occupation or expo-
sure not herein classified or classified in sup-
plements or emendations of a date later than
this manual, is hereby Classified * * *
non-insurable."

The manual also contains the following:

"The following table shows the designa-
tions which signify the classification of risks:

"1. Select.
"2. Preferred.
"2 Plus. Extra Preferred.
"3. Ordinary.
"4. Medium.
"5. Special.
"6. Hazardous.
"7. Extra Hazardous.
"8. Perilous.
"9. Extra Perilous."

It also appears from the policy itself that
Mr. Jones was classified as an "A-1 risk."

The construction of the statute was for
the court; and usually the construction and
meaning of the policy and of the application
would be for the court; but there may be
questions of fact for the jury growing out of
the meaning and usage of particular words.
In the application in the instant case occur
the following questions and answers:

"5. Of what firm are you a member or
employee? Brinn & Jensen Co.

"6. Kind of Business? Wholesale pa-
per, stationery and notions. Address 1112
Harney Street, Omaha, Nebraska.

"7. What is your occupation and the full
duties thereof? Vice-President and secre-
tary. Office and traveling duties only."

 Does the word "notions" include fire-
works? The trial court apparently held that
it did. In instructing the jury to return a
verdict for plaintiff, the court said, referring
to Mr. Jones: "He was an office man whose
duties took him into the office and there he
planned things and there he worked and then
to run in and out and about his business,
which was correctly described in his applica-
tion as the wholesale handling of paper, sta-
tionery and notions, including fireworks."

We think it cannot be said as a matter of
law that "notions" include fireworks, even
when used as descriptive of the business of

a wholesale paper concern. Plaintiff, appar-
ently realizing that the word "notions" was
indefinite, introduced testimony that it was
quite prevalent for wholesale paper concerns
to sell fireworks, but there was also evidence
that some wholesale paper concerns did not
sell them. There is no evidence that defend-
ant knew that plaintiff company sold fire-
works and there was no proof of a general
custom that would be binding upon defend-
ant.

Plaintiff also contends that even though
the sale of fireworks was not strictly within
the business described in the application, yet
the agent of the insurance company knew of
the fact and waived the strict provisions of
the policy. We think there is no merit in this
claim. The policy expressly provides that
agents of the insurance company have no au-
thority to waive any of its provisions.

In question 6 of the application, and in
the answer, information is sought and given
touching the occupation of the insured and
the duties of such occupation. While the ex-
pression "office duties" is an elastic term, we
think it cannot be said as a matter of law to
include the handling and sale of fireworks
even by an officer of a wholesale paper con-
cern.

It may be here noted that the policy in
question was taken out in January, 1922, and
that the plaintiff firm did not begin to han-
dle the larger type of fireworks until 1923.

We do not need to go into a discussion of
the meaning of the word "occupation." The
following succinct definition of the term is to
be found in the opinion of this court in Ætna
Life Ins. Co. v. Dunn, 138 F. 629, 633: "The
term 'occupation,' as employed in the policy,
implies simply that which at the time of the
accident giving the cause of action constitut-
ed the assured's principal business or pur-
suit; that which engaged his attention and
time, as distinguished from that which is in-
cidentally connected with the life of men in
any or all occupations."

See, also, Central Business Men's Asso-
ciation v. Faith, 8 F.(2d) 325 (C. C. A. 8);
Gotfredson v. German Commercial Accident
Co. (C. C. A.) 218 F. 582, L. R. A. 1915D,
312.

The court in the Ætna Life Insurance
Company Case, after reviewing numerous au-
thorities, says (page 635 of 138 F.): "The
correct test in these cases is not so much as to
whether the assured had in fact abandoned
the occupation stated in his application and
policy, but whether or not at the time of his

injury he was in fact engaged in another occupation, not merely incidental, but as a business, of a more hazardous classification."

Mr. L. M. Jensen testified as to what Mr. Jones usually did in the performance of his duties:

"Mr. Jones at the time had complete charge of what we called the stationery division of the business and did all of the buying for that line. He took care of a great deal of the correspondence with customers and had charge of the country salesmen. * * * He would wait on customers with whom he was acquainted. He would have to do some checking of stock incidental to buying the items in his end of the business. He also had charge of back orders. In a more or less general way Mr. Jensen watched the city business and Mr. Jones watched the out of town business. * * *

"Our catalogue shows that we did not handle anything but small fireworks in 1921. It was not until 1923 that we went into the business of handling the larger type of fireworks, such as bombs and exhibition rockets and the like.

" * * * The fireworks business is a seasonable business. We never sell any fireworks to speak of except in the month or six weeks prior to the 4th of July. I would say that the fireworks business is about one-third of our total business during the month preceding the 4th.

"I was up on the third floor only occasionally. I would not be in position to say as to how much or to what extent Mr. Jones was on the fourth floor during the first three days of July, 1929."

Mrs. Nelson testified:

"We always came to work at ten minutes before eight. He would stay in the main office to see that everybody was busy and there would be some orders there and he would check up on the employees and take the order sheets and check up all over the main floor and check up everybody and generally take those orders back there and lots of times he would go up and see who was on the second floor and come down to the main office and was there almost until noon and in the afternoon he would come back about two o'clock and look over his correspondence, if he hadn't done so in the morning, and then he would dictate to me perhaps an hour and a half or two hours and then go into the main office and then circle around the floors again to see everybody was busy and then come back and sign his mail and generally stay in the office until it was time to go home at five o'clock.

" * * * Mr. Jones had charge of the fireworks at the Brinn and Jensen place. The fireworks were on the fourth floor except for those we had in the front room the last couple of days. Mr. Jones frequently went up to the fourth floor. The fireworks business was heaviest from the time immediately preceding the Fourth of July. We got out exhibitions of fireworks for clubs and parks and Mr. Jones supervised that work. He wrote out the timing of the orders. He was jumping about pretty lively in those days immediately preceding the Fourth. He did the fireworks business in addition to his ordinary duties in getting out his catalogue."

That there was no "change of occupation" within the meaning of that expression may be conceded. Interstate Business Men's Acc. Ass'n v. Lester, 257 F. 225 (C. C. A. 8); Federal Life Ins. Co. v. Bailey, 13 F.(2d) 113 (C. C. A. 8). But whether the insured at the time of the accident was doing an act or thing pertaining to an occupation classified by the insurance company as more hazardous than the occupation named in the policy and application is a question not free from doubt.

Taking into consideration all of the evidence bearing upon the matter, we think it cannot be held as a matter of law that the question should be answered in the negative. On the contrary, we think it was a question for the jury to decide whether or not under all the evidence the insured was doing an act or thing that pertained to an occupation classified as more hazardous than the occupation named in the policy; and we think it was a question for the jury whether or not this act was one habitually and frequently done by the insured as part of his occupation, instead of an act done in an emergency or an act which might be "incidentally connected with the life of men in any or all occupations."

Our conclusion is that the court erred in directing a verdict for plaintiff.

The judgment is reversed with instructions to grant a new trial.